### IN THE MATTER OF: ALBERT LEE WILLIS

No. 108

(Filed 26 June 1975)

1. **Attorney and Client § 2— admission to bar — standards — good moral character**

    While a State cannot exclude a person from the practice of law for reasons that contravene the Due Process or Equal Protection Clauses of the Fourteenth Amendment, a State can require high standards for admission to the bar, including good moral character and proficiency in its laws, so long as the qualifying standards have a rational connection with the applicant's fitness or capacity to practice law.

2. **Attorney and Client § 2; Administrative Law § 1— admission to bar — qualifications determined by Legislature — delegation of authority to Board of Law Examiners**

    It is well established that the constitutional power to establish the qualifications for admission to the Bar of this State rests in the Legislature, and it is equally well settled that the Legislature may delegate a limited portion of its power as to some specific subject matter if it prescribes the standards under which the agency is to exercise the delegated authority.

3. **Attorney and Client § 2; Constitutional Law § 12— character requirements for admission to bar — constitutionality**

    The "character and general fitness" requirement of G.S. 84-24 and the "good moral character" requirement of Rule VIII of the

1

In re Willis

Rules Governing Admission to the Practice of Law in the State of N. C. are constitutionally permissible standards for admission to the Bar.

4. **Attorney and Client § 2— admission to bar — good moral character — burden on applicant**

Facts relevant to the proof of the good moral character of an applicant for admission to the N. C. Bar are largely within the knowledge of the applicant and are more accessible to him than to an investigative board; accordingly, the burden of proving his good moral character traditionally has been placed upon the applicant in this State and in other jurisdictions.

5. **Attorney and Client § 2; Constitutional Law § 12— burden of proof of moral character — authority of Board of Law Examiners to make rule**

Since the burden of proof provision of Rule VIII of the Rules Governing Admission to the Practice of Law in the State of N. C. provides for the orderly determination of an applicant's moral character, that provision is within the legitimate rule-making power constitutionally delegated to the Board of Law Examiners in G.S. 84-24.

6. **Attorney and Client § 2— Board of Law Examiners — determination of character and general fitness requirements**

The General Assembly has entrusted to the Board of Law Examiners the duty of examining applicants and providing rules and regulations for admission to the Bar; in this regard the Board of Law Examiners must determine whether applicants for admission to the Bar possess the qualifications of character and general fitness for an attorney, and if the proof offered by an applicant fails to satisfy the Board that the applicant has the requisite moral character required by G.S. 84-24 and Rule VIII, it is the Board's duty to deny his application.

7. **Administrative Law § 5— Board of Law Examiners — review of findings on appeal**

G.S. 84-24 establishes the Board of Law Examiners as an administrative agency of the State, and its findings of fact are conclusive on appeal if properly supported by the evidence.

8. **Attorney and Client § 2— moral character of bar applicant — sufficiency of findings**

Findings by the Board of Law Examiners were sufficient to support the Board's conclusion that applicant had not carried his burden of showing his good moral character where the Board found that applicant enlisted in the Air Force, was twice punished under the U. S. Code of Military Justice, and was given a general discharge under honorable conditions, applicant was arrested and investigated on a charge of burglary, was later charged with trespass, failed to appeal at trial and was found guilty, applicant was convicted of driving under the influence and was granted limited driving privileges by the court, applicant subsequently drove a vehicle in violation' of the terms of his driving privileges, and applicant's answers to the Board's questions were incomplete and misleading.

---

**In re Willis**

---

ON REHEARING.

ON petition of the Board of Law Examiners to rehear our per curiam decision filed 26 November 1974, reported in 286 N.C. 207, 209 S.E. 2d 457 (1974). The case was redocketed and reargued in the Supreme Court as No. 108 at Spring Term 1975.

In January 1972 Albert Lee Willis applied for registration before the Board of Law Examiners. He had begun the study of law in September 1970 and anticipated taking the written portion of the Bar examination in 1973 after graduation from law school. The applicant's answers to questions 22 and 23 of that application read:

"22. Are there any unsatisfied judgments against you? Yes. Balance of less than $200.00. If so, give facts. Owed on a wrecked automobile.

23.a. Have you ever been a party to any legal proceedings, either criminal, civil or military? Yes.

If so, give facts in detail, name of action, date, court, results, etc. (Need not list acting as counsel in military proceedings.) In 1965 I was acquitted in Baltimore City Court for driving under the influence. In 1970 I was found guilty of driving under the influence in the District Court of Orange County, N. C. In 1970 I was fined in Durham County District Court for driving on a restricted license.

b. Have you ever been arrested, held for investigation or as a material witness? Yes. In Catonsville, Maryland around 1963 I was arrested as a suspect and released after about 12 hours."

On 10 January 1973 the applicant filed application, including required certificates of moral character, with the Board of Law Examiners for admission to the 1973 Bar examination administered by said Board. Pertinent questions and answers appear in the application as follows:

"26. Have you ever been a party to any legal proceedings either criminal, civil or military? If so, give facts in detail, name of action, date, court, results, etc. (Need not list acting as counsel in military proceedings) : Yes. 1969 I was found guilty of driving under the influence of alcohol in Orange County District Court at Hillsboro, N. C. My license was suspended for 1 year and I was fined.

27. Have you ever been a witness in any legal proceedings? If so, give facts and details. Yes. About 1959 I ap-

peared as a witness for the defense in the case of the *State of N. C. v. Claude Green.*

28. Have you ever been charged with or questioned regarding any crime, either felony or misdemeanor? If so, give facts and details. I was questioned on suspicion in Catonsville, Maryland and released without any charges around 1962.

29. Have you ever been arrested? If so, give facts and details. Only as stated in answer to question #26.

30. Have you ever been held for investigation or as a material witness? If so, give facts and details. No.

\* \* \* \*

35. Are there any unsatisfied judgments against you? Yes. About $190.00 due on payment of an automobile with First Union Bank of Durham, N. C. If so, give facts.

\* \* \* \*

37. Have you served in the armed forces of the United States? Yes.

If so, give branch of service, dates of service, place and type of discharge. U. S. Air Force 6-54 to 8-56. Discharged under honorable conditions at Bryan Air Force Base, Texas."

Pursuant to Section 4 of Rule VIII of the Ru'es Governing Admission to the Practice of Law in the State of North Carolina, the applicant appeared before the Bar Candidate Committee for the Eighth Judicial District on 7 April 1973 for examination in regard to his moral fitness to be licensed to practice law. Based upon matters discussed at the examination and certain "evasive" answers by petitioner to questions concerning an incident in Maryland, mentioned in his answer to question 28 above, that committee recommended further review of the applicant's moral character by the Board of Law Examiners.

The applicant was advised by letter that he was to appear before the Board of Law Examiners at its 24 May 1973 meeting in Raleigh for consideration of his application and "in particular" his moral character. The incidents disclosed by applicant's answers to questions 26, 28 and 35 on his application and his discharge from the Air Force were enumerated topics of inquiry. The Board requested that the applicant furnish a certi-

---

**In re Willis**

---

fied copy of his discharge and military 201 file which would explain the facts surrounding his discharge from the Air Force. It appears the applicant received a general discharge under honorable conditions as opposed to an honorable discharge.

The applicant appeared before the Board of Law Examiners at the assigned time and chose to proceed without counsel. He neglected to produce his 201 file at that meeting, stating "I understand that the Air Force doesn't give out a 201 File." His testimony before the Board was transcribed and appears in the record before us. At the conclusion of the proceeding the Board of Law Examiners deferred action on petitioner's application until further facts were obtained.

The Board obtained a copy of the applicant's Air Force 201 file and considered his application at its 22 June 1973 meeting. Based upon evidence received in the foregoing proceedings, the Board made the following findings of fact and conclusions of law:

"1. That the applicant enlisted in the regular Air Force in July, 1954. The applicant was administered punishment under Article 15 of the United States Code of Military Justice in October, 1955, for dereliction in the performance of his duties in the 3530th Air Base Group Unit Mail Room and reduced to the grade of Airman Basic. He was further administered punishment under Article 15 of the United States Code of Military Justice in May, 1956, for disobeying a lawful order issued by his First Sergeant and reduced to the grade of Airman Basic. The record shows that the applicant was issued a general discharge from the Air Force in August, 1956, on account of continuous poor performance, indifferent attitude, lack of responsibility, immaturity and low order of intellect and potential.

2. The applicant indicated on his Application filed with the Board on January 10, 1973, in response to the question:

'28. Have you ever been charged with or questioned regarding any crime, either felony or misdemeanor? If so, give facts and details.'

that 'I was questioned on suspicion in Catonsville, Maryland and released without any charges around 1962.'

3. In May 1964, while the applicant was living in Catonsville, Maryland, he was arrested and investigated

on a charge of burglary. Later he was charged with trespass. The record reflects that the incident giving rise to this occurrence happened on or about May 6, 1964, when the applicant went to the home of Mrs. Carey Elizabeth Smith about 1:30 a.m., climbed on her porch and began knocking on the second floor bedroom window. Shortly thereafter, he was arrested by the police. He was released on bond posted by his wife. The record shows that the applicant failed to appear at the trial at Catonsville on May 8, 1964, and his bond was forfeited, a verdict of guilty of trespassing was entered and applicant was assessed a fine in the amount of $28.00.

4. In December, 1969, applicant was tried and convicted in Orange County, North Carolina, of driving under the influence of intoxicating beverages and was granted limited driving privileges by the court.

5. During the period of time applicant had limited driving privileges, he drove an automobile at a time when he was in violation of the restrictive provisions of his license and was involved in an accident in Durham County, North Carolina. Applicant was fined in Durham County District Court for driving in violation of the terms of his driving privileges.

From the foregoing Findings of Fact, the Board CONCLUDES:

That the applicant, Albert Lee Willis, has not satisfied the Board that he is possessed of good moral character and entitled to the high regard and confidence of the public."

As a result of the applicant's failure to satisfy the Board of his good moral character, the Board denied him the opportunity to take the 1973 North Carolina Bar Examination. The applicant was so notified by a letter dated 27 June 1973 and signed by Fred P. Parker III, Executive Secretary of the Board of Law Examiners.

Thereafter, the applicant, through counsel, sought a rehearing before the full Board on grounds that he had further evidence of his good moral character. The Board refused to reconsider the applicant's character and advised him to pursue normal appeal procedures provided under the Rules Governing Admission to the Practice of Law in the State of North Carolina. The

---

In re Willis

---

applicant gave notice of appeal and made another request for reconsideration of his character. The Board denied the second request stating it was "without jurisdiction."

The applicant appealed to Wake Superior Court pursuant to Rule XIII of the Rules Governing Admission to the Practice of Law in the State of North Carolina, 279 N.C. 733, 740 (1971). His exceptions to the order and decision of the Board were that (1) Section 1 of Rule VIII of the Rules Governing Admission to the Practice of Law in the State of North Carolina is violative of the Fourteenth Amendment of the United States Constitution and Article I, Section 19 of the Constitution of North Carolina because the rule contains no ascertainable standards by which good moral character can be determined, (2) G.S. 84-24 is an unlawful delegation of legislative authority and violates Article II, Section 1 of the Constitution of North Carolina, (3) the Board's order constitutes an abuse of discretion because there was insufficient evidence before the Board to support a finding of fact and conclusion that the applicant "is of insufficient moral character to stand the Bar examination," and (4) the Board, "motivated by racial prejudice," acted arbitrarily and capriciously in violation of the Federal and State Constitutions.

The matter came before Judge Henry A. McKinnon, Jr., at the January 1974 Civil Session of Wake Superior Court. Judge McKinnon entered judgment, filed 18 March 1974, sustaining the decision of the Board of Law Examiners.

The applicant appealed to this Court. The members of the Court being equally divided on the questions presented, the judgment of the superior court was thereby affirmed without becoming a precedent. We subsequently allowed the petition of the Board of Law Examiners to rehear for the purpose of considering the constitutionality of G.S. 84-24.

*Rufus L. Edmisten, Attorney General; Andrew A. Vanore, Jr., Deputy Attorney General; Fred P. Parker III, attorney, for the Board of Law Examiners, petitioner appellant.*

*Pearson, Malone, Johnson, DeJarmon & Spaulding, by W. G. Pearson II, and C. C. Malone, Jr., for Albert Lee Willis, respondent appellee.*

HUSKINS, Justice.

The sole question presented on this rehearing is whether G.S. 84-24 is a lawful delegation of legislative authority and is constitutional on its face and as applied to the applicant in this case.

G.S. 84-24, enacted in 1933 and entitled "Admission to practice," established the Board of Law Examiners "for the purpose of examining applicants and providing rules and regulations for admission to the Bar including the issuance of license therefor." The statute authorizes the Board of Law Examiners, subject to the approval of the Council of the North Carolina State Bar, to make such rules and regulations for admission to the Bar as in its judgment will promote the welfare of the State and the legal profession. Provisions of that statute pertinent to this appeal read:

> "The Board of Law Examiners shall have full power and authority to make or cause to be made such examinations and investigations as may be deemed by it necessary to satisfy it that the applicants for admission to the Bar possess *the qualifications of character and general fitness requisite for an attorney and counselor at law* and to this end the Board of Law Examiners shall have the power of subpoena and to summons and examine witnesses under oath and to compel their attendance and the production of books, papers and other documents and writings deemed by it to be necessary or material to the inquiry and shall also have authority to employ and provide such assistance as may be required to enable it to perform its duties promptly and properly." (Emphasis added.)

Rule VIII of the Rules Governing Admission to the Practice of Law in the State of North Carolina, promulgated in accordance with G.S. 84-24 and in effect at the time of the applicant's application, provides that every applicant shall have the burden of proving his good moral character and that he is entitled to the high regard and confidence of the public. 279 N.C. 733, 737 (1971). The rule requires every applicant to appear before a Bar Candidate Committee to be examined about any matter pertaining to his moral character, and states that an applicant may be required to appear before the Board. In this regard each applicant must furnish the Committee with such information as may be required on forms provided by the Board and

---

---

with such other information and documents as the Committee may reasonably require. The rule further provides that technical rules of evidence, such as the hearsay rule, need not be observed in investigations of moral character. Section (3) of Rule VIII in pertinent part reads:

> "No one shall be certified (licensed) to practice law in this State by examination or comity:
>
> \* \* \* \*
>
> (2) Who fails to disclose fully to the Board, whether requested to do so or not, any and all facts relating to any civil or criminal proceedings, charges or investigations involving the applicant, whether the same have been terminated or not in this or any other state or in any of the Federal Courts or other jurisdictions." 279 N.C. at 737.

Applicant alleges that G.S. 84-24 and Rule VIII of the Rules Governing Admission to the Practice of Law in the State of North Carolina do not contain adequate standards for the Board to follow in determining whether an applicant possesses the qualifications of character and general fitness requisite for an attorney and, therefore, the provisions are unconstitutional on their face in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and Article I, Section 19 and Article II, Section 1 of the Constitution of North Carolina. In this regard, he contends that "good moral character," as a guideline or standard of itself, will not suffice to satisfy constitutional requirements. We find this contention unsound.

The applicant relies upon *Konigsberg v. State Bar of California,* 353 U.S. 252, 1 L.Ed. 2d 810, 77 S.Ct. 722 (1957), one of several cases reaching the United States Supreme Court in which states have refused to permit applicants to practice law because bar examiners have been suspicious about applicants' loyalties and about their views on Communism and revolution. In *Konigsberg* the State Committee of Bar Examiners of California refused to certify the applicant to practice law on grounds that he had failed to prove (1) he was of good moral character and (2) he did not advocate overthrow of the Government of the United States or California by unconstitutional means. There, the United States Supreme Court held that the applicant's exclusion from the practice of law violated due process

because the evidence did not rationally support the State's finding. In reference to the use of "good moral character" as a qualification for the California Bar, the Supreme Court said:

> "The term 'good moral character' has long been used as a qualification for membership in the Bar and has served a useful purpose in this repect. However the term, by itself, is unusually ambiguous. It can be defined in an almost unlimited number of ways for any definition will necessarily reflect the attitudes, experiences, and prejudices of the definer. Such a vague qualification, which is easily adapted to fit personal view and predilections, can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law." 353 U.S. at 262-63, 1 L.Ed. 2d at 819, 77 S.Ct. at 728.

Because of the vagueness of the term "good moral character," that Court turned to California case law for a definition, but found none. The Court finally accepted, for the purpose of its decision, the definition proposed by counsel for the State of California that "good moral character" is "honesty, fairness and respect for the rights of others and for the laws of the state and nation." Although the Court considered the definition too broad, it nevertheless concluded that the State's action could not be sustained on the facts.

A similar approach was taken by the United States Supreme Court in the more recent case of *Law Students Research Council v. Wadmond*, 401 U.S. 154, 27 L.Ed. 2d 749, 91 S.Ct. 720 (1971), in which the appellants, purporting to represent a class of law students and law graduates, attacked New York's system for screening applicants for admission to the New York Bar primarily on First Amendment vagueness and overbreadth grounds. In reference to arguments alleging the unconstitutionality of New York's requirement that the Appellate Division of the State Supreme Court in the judicial department where an applicant resides must "be satisfied that such person possesses the character and general fitness requisite for an attorney and counsellor-at-law," the Supreme Court held:

> "The three-judge District Court, although divided on other questions, was unanimous in finding no constitutional infirmity in New York's statutory requirement that applicants for admission to its Bar must possess 'the character and general fitness requisite for an attorney and counsellor-

at-law.' We have no difficulty in affirming this holding. [Citations omitted.] Long usage in New York and elsewhere has given well-defined contours to this requirement, which the appellees have construed narrowly as encompassing no more than 'dishonorable conduct relevant to the legal profession,' . . . [Citations omitted.] The few reported cases in which bar admission has been denied on character grounds in New York all appear to have involved instances of misconduct clearly inconsistent with the standards of a lawyer's calling." 401 U.S. at 159, 27 L.Ed. 2d at 756, 91 S.Ct. at 724-25.

The Supreme Court went on to note that every state, the District of Columbia, Puerto Rico, Virgin Islands, and even the Supreme Court itself requires some similar qualification.

We note that both *Konigsberg* and *Law Student Research Council* involved questions of whether action by the Bar examiners of California and the entire applicant screening process of New York violated First Amendment freedoms of expression and association, and could be distinguished on that ground from the present case, which does not involve such First Amendment ramifications. Even so, those decisions of the United States Supreme Court do not support the suggestion that "good moral character" is an unconstitutional standard. To the contrary, the quoted language from those cases seems to say that the term "good moral character," although broad, has been so extensively used as a standard that its long usage and the case law surrounding that usage have given the term well-defined contours which make it a constitutionally appropriate standard.

Such has been the case in North Carolina. As early as 1760 every applicant to the Bar in this State was required by law to be of "good character." 25 State Records of North Carolina at 448 1906); Coates, Standards of the Bar, 6 N.C.L. Rev. 34 (1927). After this Court was organized in 1818, it was authorized to determine an applicant's character. In the first reported decision of this Court considering a bar application, Ex parte Thompson, 10 N.C. 354 (1824), the Court denied the applications of two applicants because of their alien status. Although not directly faced with the question of the applicants' moral character, the Court said: "Whatever discretion resides in the judges relative to the admission of attorneys ought to be exercised with a view to the advantage and security of the suitors in the several courts; for to them the license is a guarantee that

---

---

in the opinion of the magistrates signing it the licentiate is politically, not less than legally and *morally,* qualified to transact their business." (Emphasis added.) Indeed, it has been said that the possession of "good moral character" is "the cardinal condition of the attorney's admission to the bar." *In re Ebbs,* 150 N.C. 44, 63 S.E. 190 (1908), quoting from *Penobscot Bar v. Kimball,* 64 Me. 140 (1875). The importance of "good moral character" was described by Justice Brown, dissenting in *In re Applicants for License,* 143 N.C. 1, 21, 55 S.E. 635, 642 (1906), as follows:

> "The public policy of our State has always been to admit no person to the practice of the law unless he possessed an upright moral character. The possession of this by the attorney is more important, if anything, to the public and to the proper administration of justice than legal learning. Legal learning may be acquired in after years, but if the applicant passes the threshold of the bar with a bad moral character the chances are that his character will remain bad, and that he will become a disgrace instead of an ornament to his great calling—a curse instead of a benefit to his community—a Quirk, a Gammon, or a Snap, instead of a Davis, a Smith, or a Ruffin." *Accord, In re Applicants for License,* 191 N.C. 235, 131 S.E. 661 (1926).

There have been few decisions in this State squarely facing the issue of an applicant's moral character. Even so, a review of existing decisions illustrates the contours given to the requirement of "good moral character" by its long usage in this State.

In the case of *In re Dillingham,* 188 N.C. 162, 124 S.E. 130 (1924), the Court denied the applicant's application to practice law in this State because protestants filed a number of affidavits and certifications of court records which disclosed conduct by the applicant during 1919, 1920 and 1921 "amounting in many instances to violations of the criminal law, including obtaining goods by false pretense, larceny, or conspiracy to commit it, forgery, extortion and others, all of them involving moral turpitude. . . ." The applicant made no substantial denial of the charges. Instead, he claimed "he [had] turned from his evil practices and has since demeaned himself as a good citizen" and offered a certificate of several prominent citizens certifying to his good conduct for approximately two years prior to his application. In denying the application, the Court said: "[N]either the certificate presented, nor the closing statement of respond-

---
In re Willis
---

ent's purpose, commendable as it is, suffice as an assurance to us that he has the upright character required for lawful issuance of this license." The Court further noted that when one seeks to establish restoration of a character which has been deservedly forfeited, the question becomes essentially one "of time and growth."

In the case of *In re Applicants for License,* 191 N.C. 235, 131 S.E. 661 (1926), which is the last decision of this Court on the question of an applicant's moral character, the Court denied the applications of two applicants. Protestants attacked the character of the first applicant on grounds that "in his office as a justice of the peace of Wilson County, he has not only failed to make due returns and account for moneys and things intrusted to him, but in some instances, he has converted them to his own use; and that he has generally engaged in unethical practices." In response thereto, the applicant offered a large number of affidavits from citizens of Wilson County attesting to his general good character. In denying his application, the Court concluded the evidence showed "such a lack of moral perception, or careless indifference to the rights of others" that they were unable to say the applicant possessed the requisite upright character. Attempting to delineate the contours of "upright character," Chief Justice Stacy said:

> " . . . It is something more than an absence of bad character. It is the good name which the applicant has acquired, or should have acquired, through association with his fellows. It means that he must have conducted himself as a man of upright character ordinarily would, should or does. Such character expresses itself, not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing, if it is right, and the resolve not to do the pleasant thing, if it is wrong. 'Character,' said Mr. Erskine in the trial of Thomas Hardy for high treason, 'is the slow-spreading influence of opinion arising from the deportment of a man in society, as a man's deportment, good or bad, necessarily produces one circle without another and so extends itself till it unites in one general opinion.' Even more is this true when the restoration of character, as here, is the subject of consideration. It is then a matter of time and growth." 191 N.C. at 238, 131 S.E. at 663.

---

**In re Willis**

---

The character of the second applicant in *In re Applicants for License* was challenged by protestants in affidavits showing, without contradiction, that in August 1922 the applicant, a former deputy sheriff of Guilford County, attended a ball game, became intoxicated, engaged in a fight, used a deadly weapon, and as a result was indicted in six cases. He pleaded guilty to nuisance (using profane and indecent language on highway), assault and carrying a concealed weapon, and was fined by the court. Judgment was continued in the other three indictments on payment of costs. Consequently, the applicant was discharged as a deputy sheriff. The affidavits further showed that a judgment had been recovered against the applicant in a civil action for wrongful assault and that the applicant's wife had obtained a divorce from him on grounds of adultery. In the divorce proceeding the applicant was found not to be a fit and suitable person to have custody of his daughter. The applicant expressed regret at the incident giving rise to the criminal charges against him and stated he had changed his manner of living since that time. He also filed a large number of character certificates in support of his good character. The Court concluded the record was insufficient to support the applicant's upright character.

**[1]**  While a State cannot exclude a person from the practice of law for reasons that contravene the Due Process or Equal Protection Clauses of the Fourteenth Amendment, a State can require high standards for admission to the bar, including good moral character and proficiency in its laws, so long as the qualifying standards have a rational connection with the applicant's fitness or capacity to practice law. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 1 L.Ed. 2d 796, 77 S.Ct. 752 (1957).

**[2]**  It is well established that the constitutional power to establish the qualifications for admission to the Bar of this State rests in the Legislature. *In re Applicants for License*, 143 N.C. 1, 55 S.E. 635 (1906); *accord, Baker v. Varser*, 240 N.C. 260, 82 S.E. 2d 90 (1954); *State v. Ballance*, 229 N.C. 764, 51 S.E. 2d 731 (1949); *State v. Harris*, 216 N.C. 746, 6 S.E. 2d 854 (1940); *Seawell, Attorney-General v. Motor Club*, 209 N.C. 624, 184 S.E. 540 (1936); *State v. Lockey*, 198 N.C. 551, 152 S.E. 693 (1930). It is equally well settled that the Legislature may delegate a limited portion of its power as to some specific subject matter if it prescribes the standards under which the agency is to exercise the delegated authority. *Turnpike Authority v.*

---

In re Willis

---

*Pine Island,* 265 N.C. 109, 143 S.E. 2d 319 (1965). "In licensing those who desire to engage in professions or occupations such as may be proper subjects of such regulation, the Legislature may confer upon executive officers or bodies the power of granting or refusing to license persons to enter such trades or professions only when it has prescribed a sufficient standard for their guidance." *State v. Harris, supra* at 754, 6 S.E. 2d at 860. .

[3] When applicant's first contention—that G.S. 84-24 and Rule VIII are unconstitutional on their face—is viewed in light of the foregoing decisions, we hold that the "character and general fitness" requirement of G.S. 84-24 and the "good moral character" requirement of Rule VIII are constitutionally permissible standards. While we are cognizant of the broad dimensions of such standards, it is our view that one would be hard put to enunciate a better standard for admission to the Bar. There is no better test for the purpose known to us, but the Board of Law Examiners and this Court must nevertheless apply the standard judiciously. *See In re Heller,* _ _ _ F. 2d _ _ _ (D.C. Cir. decided February 26, 1975).

[4, 5] Section 1 of Rule VIII, promulgated by the Board of Law Examiners under authority of G.S. 84-24, provides: "Every applicant shall have the burden of proving that he is possessed of good moral character and that he is entitled to the high regard and confidence of the public." 279 N.C. 733, 737 (1971). The applicant argues' that this provision had its inception in, and flows from, an unlawful delegation of legislative authority in violation of the Fourteenth Amendment to the Constitution of the United States and Article II, Section 1 of the Constitution of North Carolina. In support of this argument he cites *Law Students Research Council v. Wadmond, supra,* and *Speiser v. Randall,* 357 U.S. 513, 2 L.Ed. 2d 1460, 78 S.Ct. 1332 (1958). It suffices to say that the cases cited involved restrictions on freedom of speech under the First Amendment and are not apposite to the present case. *See Konigsberg v. State Bar of California,* 366 U.S. 36, 6 L.Ed. 2d 105, 81 S.Ct. 997 (1961). Facts relevant to the proof of his good moral character are largely within the knowledge of the applicant and are more accessible to him than to an investigative board. Accordingly, the burden of proving his good moral character traditionally has been placed upon the applicant in this State and in other jurisdictions. *Baker v. Varser, supra; In re Applicants for License,* 191 N.C. 235, 131

S.E. 661 (1926); Annot., Admission to Bar—Moral Character, 64 A.L.R. 2d 301, 311 (1959). Since the burden of proof provision of Rule VIII provides for the orderly determination of an applicant's moral character, we find that provision to be within the legitimate rule-making power constitutionally delegated to the Board of Law Examiners in G.S. 84-24. *See Utilities Com. v. R. R.*, 224 N.C. 283, 29 S.E. 2d 912 (1944).

We now turn to the applicant's final contention that G.S. 84-24 was unconstitutionally applied to him by the Board of Law Examiners.

[6]    The General Assembly has entrusted to the Board of Law Examiners the duty of examining applicants and providing rules and regulations for admission to the Bar. G.S. 84-24. In this regard the Board of Law Examiners must determine whether applicants for admission to the Bar possess the qualifications of character and general fitness requisite for an attorney and counselor at law. If the proof offered by an applicant fails to satisfy the Board that the applicant has the requisite moral character required by G.S. 84-24 and Rule VIII, it is the Board's duty to deny his application. *Baker v. Varser*, 240 N.C. 260, 82 S.E. 2d 90 (1954).

[7]    G.S. 84-24 establishes the Board of Law Examiners as an administrative agency of the State, and its findings of fact are conclusive on appeal if properly supported by the evidence. *In re Berman*, 245 N.C. 612, 97 S.E. 2d 232 (1957); *Baker v. Varser, supra; Baker v. Varser*, 239 N.C. 180, 79 S.E. 2d 757 (1954). As long as there is evidence in the record which rationally justifies a finding that the applicant has failed to establish his moral fitness to practice law, this Court cannot substitute its judgment for that of the Board of Law Examiners. *Konigsberg v. State Bar of California*, 353 U.S. 252, 1 L.Ed. 2d 810, 77 S.Ct. 722 (1957); *Schware v. Board of Bar Examiners*, 353 U.S. 232, 1 L.Ed. 2d 796, 77 S.Ct. 752 (1957).

[8]    The applicant does not contend the evidence was insufficient to support the Board's findings of fact. Instead, he argues that the findings are insufficient to sustain the Board's conclusion that he had not carried his burden of showing his good moral character.

The applicant contends that under our previous decisions only conduct evincing moral turpitude, dishonesty, a turbulent or intemperate nature, baseness, vileness or depravity is relevant

to one's moral character for admission to the Bar. In this regard he argues that his military record is removed in time by more than fifteen years and contains nothing suggesting dishonorable conduct relevant to the legal profession; that the Maryland incident, contained in findings of fact two and three by the Board, was disclosed to the extent that he recalled what happened and that the resulting conviction of trespass does not involve moral turpitude; and that driving under the influence of intoxicating beverages and driving in violation of a limited driving permit do not involve moral turpitude. While we are inclined to agree that the above conduct of the applicant does not involve the moral turpitude evinced by the applicants in *In re Applicants for License,* 191 N.C. 235, 131 S.E. 661 (1926), and *In re Dillingham,* 188 N.C. 162, 124 S.E. 130 (1924), we are not persuaded that the Board's conclusion is not rationally justified by the evidence.

The traits of character and conduct evinced by the applicant's military record as an enlisted man in the Air Force cannot be regarded as irrelevant to the determination of his moral character for admission to the Bar. Dereliction of duty and an indifferent attitude toward one's obligations, if carried into the legal profession, are certainly character traits undeserving of public confidence. The legal profession is "neither a place of refuge nor a reformatory for those who have stumbled in other fields." *In re Applicants for License,* 191 N.C. 235, 131 S.E. 661 (1926). Furthermore, applicant's characterization of the type of discharge he received, in response to question 37 on his application, as "[d]ischarged under honorable conditions," when he now admits he received a general discharge under honorable conditions, was misleading and gives rise to the inference that he was trying to conceal the fact that he did not receive an honorable discharge. He also did not disclose, in responding to question 26 on his application, that while he was in the Air Force he was punished twice under Article 15 of the United States Code of Military Justice. How the character traits indicated by his military record were affected by the lapse of time, by his change in fields of endeavor, and by his answers to questions 26 and 37 was for the Board of Law Examiners to determine from all the testimony and evidence before it.

Similarly, the incident in Maryland, disclosed in the Board's findings of fact two and three, cannot be dismissed out of hand as a gross indiscretion on the part of the applicant. The circum-

stances surrounding the initial charge of burglary and his subsequent conviction of trespass are some evidence of the applicant's character at the time of the incident. While our decisions are clear that criminal conduct is inconsistent with the moral character required of an applicant to the Bar, the applicant's explanation of this incident, if accepted as true, would seem to rebut any suggestion that this one incident alone would be a sufficient indication of bad moral character to exclude him from the practice of law. However, it is apparent, when findings of fact two and three are read together, that the Board of Law Examiners was as concerned, if not more so, with the applicant's failure to fully disclose the incident in his application. Misrepresentations and evasive or misleading responses, which could obstruct full investigation into the moral character of a Bar applicant, are inconsistent with the truthfulness and candor required of a practicing attorney. *Carver v. Clephane,* 137 F. 2d 685 (D.C. Cir. 1943) ; *In re Meyerson,* 190 Md. 671, 59 A. 2d 489 (1948) ; *In re Greenblatt,* 253 App. Div. 391, 2 N.Y.S. 2d 569 (1938) ; *see* Annot., Admission to Bar—Moral Character, 64 A.L.R. 2d 301, 318 (1959).

Finding of fact four represents applicant's conviction and restriction to limited driving privileges in 1969 for driving under the influence of intoxicating beverages. While this offense of itself does not evince such a lack of good moral character as to deprive the applicant of a license to practice law, it does indicate a willful disregard for the very laws which he seeks to advocate on behalf of the public. Moreover, any character impugning implications which do arise from such conduct are compounded by his subsequent driving in violation of the restrictions placed on his driving privileges by the court for that offense as found by the Board in finding of fact number five. Although the last offense appears on the applicant's application for registration, he neglected to include it on his application for admission to the Bar examination.

Rule VIII places on the applicant the burden of proving that he is possessed of good moral character and that he is entitled to the high regard and confidence of the public. It also requires the applicant to make full disclosure of any civil and criminal proceedings involving him. 279 N.C. 733, 737 (1971). Nothing in the Fourteenth Amendment's protection against arbitrary State action forbids a State from denying admission to a Bar applicant on grounds that he refuses to provide unprivileged

answers to questions having a substantial relevance to his qualifications. *Konigsberg v. State Bar of California*, 366 U.S. 36, 6 L.Ed. 2d 105, 81 S.Ct. 997 (1961).

When the Board's findings of fact and conclusions of law are viewed in the context of the entire record as submitted, we conclude that they are rationally justified by the evidence. "[S]atisfaction of the requirement of moral character involves an exercise of delicate judgment on the part of those who reach a conclusion, having heard and seen the applicant for admission, a judgment of which it may be said, as it was of 'many honest and sensible judgments' in a different context, that it expresses 'an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions; impressions which may lie beneath consciousness without losing their worth.'" *Schware v. Board of Bar Examiners*, 353 U.S. 232, 248, 1 L.Ed. 2d 796, 807, 77 S.Ct. 752, 761 (1957) (Frankfurter, J., concurring).

We find nothing in this record which indicates arbitrary, discriminatory or capricious application of the good moral character standard by the Board of Law Examiners. The decision of the Board and the judgment of Wake Superior Court affirming that decision are therefore

Affirmed.